**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| JOSHUA QUINCY BURNS,<br><br>Plaintiff,<br><br>v.<br><br>BETHANY MOHR, M.D., in her individual capacity; MICHAEL ARNTZ, in his individual capacity; and the CITY OF BRIGHTON, a Michigan municipal corporation,<br><br>Defendants. | Case No.<br><br>Hon.<br><br>Magistrate Judge |

---

# <u>COMPLAINT AND JURY DEMAND</u>

Plaintiff Joshua Quincy Burns, through counsel, states as follows for his Complaint against Defendants:

## INTRODUCTION

1. In 2015 Joshua Burns was convicted of second-degree child abuse for injuring his infant daughter, N.B. He spent nearly nine months in the Livingston County Jail and three more years on probation, and for most of the first two years of his daughter's life he was barred from contact with her. On November 21, 2024, on the stipulation of the Michigan Department of Attorney General, the Livingston

County Circuit Court vacated his conviction and sentence and dismissed the charge.

2. The prosecution rested on one source: Defendant Dr. Bethany Mohr, the medical director of the University of Michigan Child Protection Team. Defendant Detective Arntz of the Brighton Police Department, who swore out the complaint, consulted no other physician.

3. Before Mr. Burns was charged, Dr. Mohr told Detective Arntz that there was "no other medical explanation" for N.B.'s findings and reported in writing that the findings were "diagnostic of abusive head trauma." At the same time, Dr. Mohr was privately asking a leading pediatric ophthalmologist "what to say (if anything)" about N.B.'s persistently and markedly elevated platelet counts. On April 5, 2014, that specialist wrote back that the condition "could be considered to throw the retinal findings into question. We just don't know."

4. Dr. Mohr did not tell the police or the prosecutor what the specialist said. The next morning she amended her chart to note that "Naomi has thrombocytosis," without mentioning the specialist's caveat. Three days later, Detective Arntz closed his investigation and sent it to the prosecutor, and Mr. Burns was charged on the strength of Dr. Mohr's opinion. Mr. Burns brings this action under 42 U.S.C. § 1983 and Michigan law to recover for the prosecution, conviction and confinement that followed.

## JURISDICTION AND VENUE

5. This action arises under 42 U.S.C. §§ 1983 and 1988 and the Fourth and Fourteenth Amendments to the United States Constitution. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4).

6. The Court has supplemental jurisdiction over Plaintiff's state-law claim under 28 U.S.C. § 1367(a) because it forms part of the same case or controversy as the federal claims.

7. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because, on information and belief, Defendants reside in this District and the events giving rise to the claims occurred in Livingston and Washtenaw Counties, Michigan, which lie in the Southern Division of this District. Because the prosecution was undertaken by Livingston County, for assignment purposes venue is proper for assignment under Eastern District of Michigan LR 83.10 for the holding of court for cases arising from Livingston County.

## PARTIES

8. Plaintiff Joshua Quincy Burns is an adult who resides in Rockwell, Texas. At the time of the events alleged he resided in Brighton, Livingston County, Michigan.

9. Defendant Bethany Mohr, M.D., is a physician who, at all relevant times, was employed by the University of Michigan, a public body and arm of the

State of Michigan, as a Clinical Assistant Professor in the Department of Pediatrics and as Medical Director of the University of Michigan Health System Child Protection Team. In that role she conducted child-abuse evaluations at C.S. Mott Children's Hospital in Ann Arbor, made reports to Children's Protective Services, and provided information, reports and opinions to police and prosecutors for use in criminal investigations. She acted under color of state law at all relevant times. She is sued in her individual capacity.

10. Defendant Michael Arntz (badge no. 10) was at all relevant times a detective with the Brighton Police Department, the officer in charge of the investigation of Plaintiff, and the complaining witness on the felony complaint against Plaintiff. He acted under color of state law at all relevant times. He is sued in his individual capacity.

11. Defendant City of Brighton is a municipal corporation organized under the laws of Michigan that operates the Brighton Police Department and is responsible for its policies, practices, customs and training.

## FACTUAL ALLEGATIONS

### A. N.B.'s birth and illness

12. N.B., Plaintiff's daughter, was born on January 7, 2014, after a failed vacuum-assisted delivery that ended in an emergency Caesarean section. Her

newborn examination noted caput and molding of the head, and her mother later described a significant scalp hematoma after the delivery.

13. On Saturday, March 15, 2014, while Plaintiff was caring for N.B. alone at home, she lunged forward off his knee while he was burping her. Plaintiff caught her by the face before she fell. She had a light bruise on her forehead afterward.

14. Beginning the next day, N.B. vomited repeatedly. Plaintiff and N.B.'s mother took her to the St. Joseph Mercy Hospital emergency department in Ann Arbor on March 16 and again on March 17, 2014, where she was diagnosed with a viral gastrointestinal illness and released. Her platelet count on March 17 was 707,000, well above the normal range of up to about 450,000.

15. On March 18, 2014, N.B. was admitted to C.S. Mott Children's Hospital with apnea, hypothermia, low blood pressure and seizure activity. A brain MRI was read as showing "[p]rominent extra-axial CSF" that "may relate to benign external hydrocephalus," with "[n]o extra-axial hemorrhage" and an "[o]therwise unremarkable MRI of the brain." She was treated for viral gastroenteritis with provoked seizures and discharged on March 24, 2014, then returned by ambulance that night with apnea.

16. On March 26, 2014, during an eye examination ordered to look for a metabolic disorder, an ophthalmologist found bilateral retinal hemorrhages. On

March 27, 2014, after Dr. Mohr reviewed the March 18 MRI with neuroradiology, an addendum re-read it to show subdural collections, including bilateral frontal and temporal collections and smaller parietal and cerebellar collections. Dr. Mohr's notes record that she and another physician discussed "contacting risk management" about the original reading.

17. Throughout her hospitalization, N.B. had persistent thrombocytosis, an abnormally high platelet count. Her counts were 707,000 on March 17, 601,000 on March 18, 781,000 on March 21, 725,000 on March 25, 785,000 on March 26, and 909,000 on March 28, 2014, against a normal range of roughly 150,000 to 450,000.

**B. Dr. Mohr's evaluation and her knowledge of the platelet issue**

18. On March 27–28, 2014, Dr. Mohr evaluated N.B. as the Child Protection Team physician. Her written consultation, which she later faxed to Detective Arntz, stated that the bilateral frontal and anterior temporal subdural hemorrhages "could have occurred at the time of her birth," noted N.B.'s platelet count of 707,000, and recommended that Pediatric Hematology be consulted to ensure the hemorrhages were "not related to an underlying bleeding diathesis" and "to comment on Naomi's thrombophilia."

19. Dr. Mohr nonetheless concluded on March 27–28, 2014 that abusive head trauma was "most likely," and filed a report with Children's Protective Services.

20. The hematology consultation performed on March 28, 2014 addressed only bleeding disorders. It did not mention N.B.'s platelet count, thrombocytosis, or any clotting mechanism. No physician evaluated, before Plaintiff was charged, whether N.B.'s thrombocytosis could have caused or contributed to her retinal or intracranial findings, and no venous-thrombosis work-up was done.

21. Dr. Mohr's March 31, 2014 interim summary again listed N.B.'s platelet count of 909,000 as elevated, but did not discuss it.

**C. The police investigation relied entirely on Dr. Mohr**

22. On March 28, 2014, Livingston County CPS worker Mark Wheeler asked the Brighton Police Department to open a joint investigation. Detective Arntz was assigned. He briefed the on-call assistant prosecuting attorney, Dan Garber, the same day or the next.

23. On March 29, 2014, Dr. Mohr told Detective Arntz by telephone that N.B.'s injuries were consistent with physical abuse or a "violent event such as a car accident," that she had seen "several bilateral subdural hematomas that were not seen by the other doctor," and that the injuries "could not have been created by the fall" Plaintiff described. According to Detective Arntz's report of the call, she

did not tell him that the frontal and temporal collections could be birth-related or that N.B. had an unexplained, abnormally high platelet count. Dr. Mohr faxed him her written reports, including her March 27–28 consultation.

24. The same day, Detective Arntz interviewed Plaintiff and N.B.'s mother at the Brighton police station. The interviews were video-recorded and logged as evidence. Detective Arntz did not copy or preserve the recordings. When the prosecutor asked for them, he checked on May 13, 2014 and reported that a recent system upgrade had shortened retention from four months to three weeks and that the video had "purged and is no longer available."

25. Detective Arntz consulted no physician other than Dr. Mohr at any point in the investigation. He testified at trial that Dr. Mohr was the only doctor who explained the retinal hemorrhages to him and the only doctor he consulted.

**D. April 2–5, 2014: Dr. Mohr seeks and receives a specialist's caveat**

26. On April 2, 2014, at 1:53 p.m., Dr. Mohr e-mailed Dr. Alex V. Levin, Chief of Pediatric Ophthalmology and Ocular Genetics at Wills Eye Institute in Philadelphia, with the subject line "Tough Case." She summarized N.B.'s history, attached retinal photographs, and wrote: "Of note, electrolytes always normal; but, persistent thrombophilia, 600,000s–900,000s. Your thoughts would be much appreciated."

27. Dr. Levin is a published authority on retinal hemorrhages in infants. Dr. Mohr later testified that he is the proponent of the view that a high platelet count can act as a "modulating factor" that changes the appearance of retinal hemorrhages.

28. On April 3, 2014, at 8:44 a.m., Dr. Mohr signed a Child Protection Team "Interim Summary" stating that N.B. had "underwent an extensive hematological evaluation with no evidence of a bleeding/coagulation disorder," that there was "no apparent medical etiology" for her findings, and that the parietal and cerebellar subdural hemorrhages and retinal hemorrhages were "diagnostic of abusive head trauma." The Interim Summary did not mention N.B.'s thrombocytosis or the question Dr. Mohr had put to Dr. Levin the day before. Dr. Mohr's office faxed the Interim Summary to the Brighton Police Department at 9:41 a.m. that day. A von Willebrand panel was still outstanding. When it returned on April 7, 2014, it was "slightly below the reference range" and Dr. Mohr recommended repeat testing at six months.

29. Also on April 3, 2014, Dr. Mohr telephoned Detective Arntz. She told him that the "final two tests" for a blood disorder or leukemia had "returned normal," that in her opinion N.B.'s injuries resulted from physical abuse, and that there was "no other medical explanation" for the retinal and subdural hemorrhages.

She did not tell him that she had asked Dr. Levin about N.B.'s abnormal platelet counts or that the question was unresolved.

30. Dr. Mohr also described to Detective Arntz a March 31, 2014 meeting at which she asked Plaintiff to demonstrate the March 15 incident with a doll. She told Detective Arntz that, even if Plaintiff had used the force he demonstrated, "it alone would not have caused the type and severity of injuries Naomi had." Her own note of the meeting likewise states that Plaintiff's account "does not provide a clear mechanism" for the injuries.

31. At 5:15 p.m. on April 3, 2014, Dr. Levin replied that he could not think of another diagnosis "other than abuse assuming no obvious coagulopathy or other event." At 5:51 p.m., Dr. Mohr responded: "My question was mainly about what to say (if anything) about the thrombophilia."

32. On Saturday, April 5, 2014, at 11:06 p.m., Dr. Levin answered that question in writing: "Do you mean thrombocytosis? Either way we have no idea what this might do re retinal bleeding and could be considered to throw the retinal findings into question. We just don't know."

33. The retinal hemorrhages were the cornerstone of Dr. Mohr's diagnosis. She later testified that without the retinal and cerebellar findings there "would be concern but not diagnostic," and that the retinal hemorrhages were the only finding that required an acceleration-deceleration mechanism.

34. At 9:09 a.m. on Sunday, April 6, 2014, the morning after Dr. Levin's reply, Dr. Mohr added an addendum to her March 27 consultation stating only that "Naomi has thrombocytosis," to correct her earlier word "thrombophilia." The addendum said nothing about Dr. Levin's caveat.

35. Dr. Mohr never told Detective Arntz, the Livingston County Prosecutor's Office or CPS that Dr. Levin had written that N.B.'s thrombocytosis "could be considered to throw the retinal findings into question." She never withdrew or qualified her statements that the findings were "diagnostic of abusive head trauma" and that there was "no other medical explanation." None of her later addenda, dated April 7, April 10 and April 28, 2014, mentions thrombocytosis or Dr. Levin.

**E. The charging decision**

36. On April 8, 2014, Detective Arntz received an "addendum" to N.B.'s medical report from Dr. Mohr, closed his investigation, and sent the case to the Livingston County Prosecutor's Office ("TOT Prosecutor"). On information and belief, the addendum was Dr. Mohr's April 7, 2014 addendum to her Interim Summary, which UM Hospitals faxed on April 8, 2014. It reported the von Willebrand results and did not disclose Dr. Levin's April 5 caveat.

37. On information and belief, Dr. Mohr also communicated directly by e-mail with the Livingston County Prosecutor's Office and with the Department of

Human Services about N.B. before Plaintiff was charged. On June 23, 2014, the University of Michigan's Office of General Counsel confirmed that it held "emails between Dr. Mohr and individuals at the prosecuting attorney's office, as well as the Department of Human Services," but refused to produce them to the defense.

38. Detective Arntz's warrant request and the information he presented to the prosecutor relied on Dr. Mohr's conclusions. On information and belief, it did not disclose that Dr. Mohr had herself written that the frontal and temporal collections could be birth-related, that the platelet question had never been evaluated, that Dr. Mohr had sought an outside opinion on it, or that the interview recordings had not been preserved.

39. Detective Arntz knew, or recklessly disregarded, that Dr. Mohr's opinion had significant unresolved qualifications. He had received her March 28 consultation, which noted the 707,000 platelet count, referred the "thrombophilia" to hematology, and acknowledged a birth-related explanation for some of the bleeding. He nonetheless presented the case as resting on a medical certainty and sought no second opinion.

40. On May 8, 2014, an assistant prosecuting attorney authorized a felony complaint charging Plaintiff with second-degree child abuse, MCL 750.136b(3), for "striking, shaking or roughly handling the infant" on or about March 15, 2014. Detective Arntz was the complaining witness. Dr. Mohr was a listed witness.

41. But for Defendants' false statements and material omissions, the prosecutor would not have authorized the charge, because there was no evidence of abuse apart from Dr. Mohr's opinion. No one saw Plaintiff harm N.B., N.B. had no fractures on skeletal survey, and the only external sign was light facial bruising consistent with Plaintiff's account of catching her.

42. Dr. Mohr had reasons to stand by her diagnosis that she did not disclose. The University of Michigan received Department of Human Services contract funds for her child-protection work, part of which paid her salary; she had testified as an expert about 100 times, always for the prosecution; and she discarded her handwritten notes after writing her reports.

**F. Seizure, prosecution and conviction**

43. On May 9, 2014, Plaintiff was arraigned in the 53rd District Court, booked into the Livingston County Jail, and released that afternoon on a $10,000 ten-percent bond. His bond conditions barred him from leaving Michigan without permission and from contact with his daughter, and required drug and alcohol testing at least three times a week.

44. At the preliminary examination on June 10 and June 24, 2014, the only medical evidence was Dr. Mohr's opinion. She testified that "diagnostic" meant there was no other explanation: "If I thought there was another explanation, I would not say … diagnostic." The district court bound Plaintiff over on June 24,

2014, relying on Dr. Mohr's opinion of abuse together with the manner in which Plaintiff caught N.B. by the face.

45. The University of Michigan produced the Mohr–Levin e-mails to defense counsel under subpoena on June 23, 2014, the day before the bindover, while refusing to produce Dr. Mohr's e-mails with the prosecutor's office and DHS. The prosecution nonetheless continued the case.

46. At the jury trial in January 2015, Dr. Mohr testified that N.B.'s combination of findings was "close to 100 percent" diagnostic of abuse. When defense counsel tried to elicit what Dr. Levin had told her, the prosecution objected on hearsay grounds and the court excluded Dr. Levin's statements. The jury never learned that the specialist Dr. Mohr consulted had written that N.B.'s thrombocytosis "could be considered to throw the retinal findings into question." These allegations describe how the prosecution proceeded and are not a basis for liability for any defendant's testimony.

47. On January 27, 2015, the jury convicted Plaintiff of second-degree child abuse. On March 19, 2015, the court sentenced him to three years' probation, with the first 12 months to be served in the Livingston County Jail, and ordered no contact with his daughter.

48. Plaintiff was taken into custody at sentencing on March 19, 2015 and confined in the Livingston County Jail until December 8, 2015, about 265 days.

His motions for bond pending appeal, sentence reduction and day parole were denied. He then remained on probation, subject to supervision, testing, travel restrictions and protective conditions, until the court discharged him on March 13, 2018.

49. The Michigan Court of Appeals affirmed on November 1, 2016, describing the trial as a disagreement among medical experts. People v. Burns, No. 327179 (Mich. Ct. App. Nov. 1, 2016) (unpublished). The Michigan Supreme Court denied leave to appeal.

50. The conviction also had consequences in the parallel child-protective proceeding. The Department of Health and Human Services cited the conviction in seeking termination of Plaintiff's parental rights. On July 29, 2015, the family court found that termination was not in N.B.'s best interest. Because Plaintiff was in jail, and visits at the jail were barred, he saw his daughter only once, through glass on October 1, 2015, after more than 545 days apart; in-person visits resumed after his release in December 2015. The family court ended its jurisdiction on June 7, 2016, with N.B. in her parents' care.

**G. Vacatur and dismissal**

51. Working with the Michigan Innocence Clinic, which began representing him in 2015, Plaintiff sought post-conviction relief.

52. On November 21, 2024, the Livingston County Circuit Court (Hon. Miriam A. Cavanaugh) entered a Stipulated Order to Vacate Conviction and Dismiss Charge in People v. Burns, No. 14-22070-FH, on the stipulation of the Michigan Department of Attorney General. The order vacated Plaintiff's conviction and sentence and dismissed the charge "in the interests of justice."

53. The prosecution of Plaintiff thus ended without a conviction. The charge has not been refiled.

54. Plaintiff's claims for malicious prosecution and fabrication of evidence accrued on November 21, 2024, when the prosecution terminated in his favor.

**H. Damages**

55. When he was charged, Plaintiff was an airline transport pilot who had flown for Endeavor Air, a Delta Air Lines subsidiary, since 2007, earning about $120,000 a year with benefits, and had just bid into a captain position. After his conviction, the Livingston County Prosecutor's Office faxed the verdict to a Federal Aviation Administration safety hotline, and the FAA reopened his medical certification. He was on unpaid leave throughout his incarceration and probation, and Endeavor Air terminated his employment in or about September 2016 because of the conviction.

56. As a direct and proximate result of Defendants' conduct, Plaintiff suffered loss of liberty, including about 265 days in jail, a year of bond restrictions and nearly three years of probation; separation from his infant daughter for most of the first two years of her life; listing on the Michigan Child Abuse and Neglect Central Registry; severe emotional distress requiring treatment, humiliation and damage to his reputation; legal fees and costs of defending the criminal case; court costs of $730, a $4,860 probation supervision fee, and jail fees billed at $11,875.07; and loss of income, benefits and earning capacity as a pilot.

## COUNT I

## 42 U.S.C. § 1983 — Malicious Prosecution in Violation of the Fourth Amendment

(Against Defendants Mohr and Arntz)

57. Plaintiff incorporates all preceding paragraphs.

58. Defendants Mohr and Arntz each made, influenced or participated in the decision to prosecute Plaintiff. Dr. Mohr supplied the only evidence of abuse, through her reports and her statements to Detective Arntz and, on information and belief, to the prosecutor's office. Detective Arntz built the case on Dr. Mohr's opinion alone, presented it to the prosecutor, and swore to the felony complaint as complaining witness.

59. There was no probable cause for the prosecution. Defendants obtained and continued it through statements that were knowingly or recklessly false or misleading, including that N.B.'s findings were "diagnostic of abusive head trauma" and that there was "no other medical explanation" for them, and through material omissions, including that the significance of N.B.'s thrombocytosis had never been evaluated, the possibility that some of the bleeding dated from birth, and Dr. Levin's written caveat that the thrombocytosis "could be considered to throw the retinal findings into question." Without those statements, and with the omitted facts included, the information presented would not have established probable cause.

60. To the extent the bindover or the verdict could otherwise create a presumption of probable cause, it is rebutted because each rested on Defendants' knowing or reckless misstatements, omissions and fabricated evidence made outside of any testimony, which Defendants set in motion before Plaintiff was charged. *King v. Harwood*, 852 F.3d 568, 580 (6th Cir. 2017); *Darrah v. City of Oak Park*, 255 F.3d 301, 311 (6th Cir. 2001); *Hinchman v. Moore*, 312 F.3d 198, 204 (6th Cir. 2002).

61. As a consequence of the legal proceeding, Plaintiff suffered deprivations of liberty apart from any initial seizure, including booking and bond

conditions beginning May 9, 2014, about 265 days of incarceration, and probation supervision until March 13, 2018.

62. The criminal proceeding terminated in Plaintiff's favor when it ended without a conviction on November 21, 2024. *Thompson v. Clark*, 596 U.S. 36, 46-49 (2022).

63. Defendants acted intentionally, or with reckless and callous indifference to Plaintiff's clearly established Fourth Amendment right to be free from prosecution without probable cause.

64. As a direct and proximate result, Plaintiff suffered the damages described above.

65. Plaintiff's right not to be seized and detained without probable cause based on false statements or material omissions was clearly established long before March 2014. See *Gregory v. Louisville,* 444 F.3d 725, 744 n.8 (6th Cir. 2006); *Yancey v. Carroll County,* 876 F.2d 1238, 1243 (6th Cir. 1989).

**COUNT II**

**42 U.S.C. § 1983 — Fabrication of Evidence in Violation of the Fourteenth Amendment Due Process Clause**

(Against Defendants Mohr and Arntz)

66. Plaintiff incorporates all preceding paragraphs.

67. Defendant Mohr knowingly fabricated evidence against Plaintiff outside of any testimony, including by: (a) reporting in writing and orally to police, before charging, that N.B.'s findings were "diagnostic of abusive head trauma" and that there was "no other medical explanation" and "no apparent medical etiology" for them, when Dr. Mohr knew that N.B. had persistent thrombocytosis that no one had evaluated as a cause, and was at that moment asking a specialist "what to say (if anything)" about it; (b) leaving those statements uncorrected, and writing an addendum that noted only that "Naomi has thrombocytosis," after the specialist wrote that the thrombocytosis "could be considered to throw the retinal findings into question"; and (c) describing the subdural findings to police as having been missed by "the other doctor" without disclosing her own written assessment that the larger collections could date from birth.

68. Defendant Arntz knowingly or recklessly incorporated Dr. Mohr's misleading statements into his reports and charging request as established fact, and omitted the contrary information in his possession.

69. There is a reasonable likelihood that the fabricated evidence affected the decisions of the prosecutor to charge, of the court to bind Plaintiff over, and of the jury to convict.

70. Plaintiff's constitutional right to be free from arrest and prosecution based upon fabrication of evidence by a police officer acting in a governmental

capacity to manufacture probable cause for an arrest was clearly established before March 2014, the earliest possible date of police misconduct. *Jackson v. City of Cleveland*, 925 F.3d at 793, 825 (6th Cir. 2019) (fabrication of evidence claim clearly established in 1975); *Spurlock v. Satterfield*, 167 F.3d 995, 1005–06 (6th Cir. 1999).

71. As a direct and proximate result, Plaintiff suffered the damages described above.

**COUNT III**

**42 U.S.C. § 1983 — Suppression of Exculpatory Evidence in Violation of the Fourteenth Amendment Due Process Clause**

(Against Defendants Mohr and Arntz)

72. Plaintiff incorporates all preceding paragraphs.

73. Police officers, and forensic and medical investigators who perform investigative functions for the State, have a duty under the Due Process Clause not to withhold known exculpatory or impeaching evidence from the prosecutor. *Moldowan v. City of Warren*, 578 F.3d 351, 377 (6th Cir. 2009).

74. Defendant Mohr, acting as an investigator for CPS and the police, withheld from Detective Arntz and the prosecutor Dr. Levin's April 5, 2014 opinion and the fact that she had sought it because the platelet question was

unresolved. On information and belief, she also withheld from the prosecution's file the full content of her communications with the prosecutor's office and DHS.

75. Defendant Arntz intentionally or inadvertently withheld from the prosecutor, or failed to preserve, exculpatory and impeaching evidence, including the video recordings of Plaintiff's March 29, 2014 interview, which he logged as evidence on April 4, 2014 but did not copy until the prosecutor asked for them on May 13, 2014, by which time they had been purged.

76. The withheld evidence was material. It would have undermined the only evidence that a crime occurred and, if disclosed to the prosecutor before charging and before bindover, would probably have changed the outcome of those decisions and the course of the prosecution.

77. Defendants acted deliberately or with reckless disregard for Plaintiff's clearly established due-process rights.

78. As a direct and proximate result, Plaintiff suffered the damages described above.

79. Plaintiff's right to be provided with material exculpatory and impeachment evidence ("*Brady*" evidence), was clearly established before Plaintiff's January 2015 trial. *See Moldowan v. City of Warren*, 578 F.3d. 351, 382 (6th Cir. 2009) ("In fact, at least three circuits recognized prior to August 1990, the

earliest possible date for Detective Ingles' involvement in the case, that this right was clearly established.").

**COUNT IV**

**42 U.S.C. § 1983 — Municipal Liability**

(Against Defendant City of Brighton)

80. Plaintiff incorporates all preceding paragraphs.

81. The constitutional violations described above were caused by the policies, customs and practices of the City of Brighton, including (a) a practice of seeking criminal charges in suspected abusive-head-trauma cases on the uncorroborated opinion of a single child-abuse pediatrician, without independent medical review; (b) a video-retention system and practice, adopted with a system upgrade in early 2014, that purged recorded suspect interviews after three weeks, before charging decisions were made; and (c) a failure to train and supervise detectives on investigating medical-diagnosis-based child-abuse allegations and on disclosing exculpatory information to prosecutors.

82. The City's policymakers knew, or it was obvious, that these policies and training failures were likely to result in prosecutions without probable cause and the loss of exculpatory evidence, and they were deliberately indifferent to that risk.

83. These policies, customs and failures were the moving force behind the violation of Plaintiff's rights and the damages described above.

**COUNT V**

**Malicious Prosecution Under Michigan Common Law (Supplemental Claim)**

(Against Defendants Mohr and Arntz)

84. Plaintiff incorporates all preceding paragraphs.

85. Defendants instituted, procured or continued a criminal prosecution against Plaintiff. Defendant Arntz swore to the felony complaint as complaining witness. Defendant Mohr knowingly gave police and prosecutors false and misleading information on which the prosecution was based, and the prosecutor's decision to charge was not an independent exercise of discretion because it relied on that information.

86. The prosecution terminated in Plaintiff's favor when his conviction was vacated and the charge dismissed on November 21, 2024, on the stipulation of the Attorney General, and the charge has not been refiled. *Cox v. Williams*, 233 Mich. App. 388, 392 (1999).

87. There was no probable cause for the prosecution, for the reasons alleged in Count I.

88. Defendants acted with malice, meaning for a purpose other than bringing an offender to justice, as shown by, among other things, Dr. Mohr's

decision to withhold the specialist's caveat after asking "what to say (if anything)" about the platelet issue, her financial and professional stake in child-abuse findings, and Detective Arntz's reliance on a single, qualified opinion while failing to preserve the interview recordings.

89. Defendants are not entitled to governmental immunity because their conduct was intentional, was not undertaken in good faith, and was undertaken with malice and without probable cause. *Odom v. Wayne County*, 482 Mich. 459, 481-82 (2008); *Renda v. International Union, UAW*, 366 Mich. 58, 97-100; 114 N.W.2d 343 (1962) (Malice may be inferred from lack of probable cause); *Ramsey v. Rivard*, 110 F.4th 860, 870 (6th Cir. 2024) ("A jury can infer lack of good faith from a police officer's lie that formed the basis for an arrest.").

90. Defendant Mohr is not entitled to immunity under the Child Protection Law because her statements to police were not made in good faith.

91. This claim is timely because it was filed within two years after the prosecution terminated in Plaintiff's favor.

92. As a direct and proximate result, Plaintiff suffered the damages described above, including special injury to his liberty, reputation, family relationships and earning capacity.

## RELIEF REQUESTED

Plaintiff requests that the Court enter judgment in his favor and against Defendants, jointly and severally, and award:

(a) compensatory damages in an amount to be determined by the jury;

(b) punitive damages against Defendants Mohr and Arntz individually on the federal claims, in an amount to be determined by the jury;

(c) all damages allowed under MCL 600.2907 and the common law of the State of Michigan, together with pre-judgment interest, costs and attorney fees allowed under state law;

(d) reasonable attorney fees and costs under 42 U.S.C. § 1988;

(e) pre-judgment and post-judgment interest as allowed by law; and

(f) such other relief as the Court finds just.

Respectfully submitted,

*s/Wolfgang Mueller*
MUELLER LAW FIRM
41850 W. 11 Mile Road, Ste. 101
Novi, MI 48375
(248) 489-9653
wolf@wolfmuellerlaw.com
(P43728)

Local Counsel for Plaintiff

/s/Jon Neuleib
**THE OPPENHEIMER FIRM**
Jon Neuleib (Pending Admission)
Michael Oppenheimer (Pending Admission)
jonn@eolawus.com
223 W. Jackson Blvd., Suite 612
Chicago, IL 60606
(312) 327-3370

Counsel for Plaintiff Pending Application for Admission

Dated: November 19, 2026

**JURY DEMAND**

Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

s/Wolfgang Mueller
MUELLER LAW FIRM
41850 W. 11 Mile Road, Ste. 101
Novi, MI 48375
(248) 489-9653
wolf@wolfmuellerlaw.com
(P43728)

Local Counsel for Plaintiff

*/s/Jon Neuleib*
**THE OPPENHEIMER FIRM**
Jon Neuleib (Pending Admission)
Michael Oppenheimer (Pending Admission)
jonn@eolawus.com
223 W. Jackson Blvd., Suite 612
Chicago, IL 60606
(312) 327-3370

Counsel for Plaintiff Pending Application for Admission

Dated: November 19, 2026